In the Supreme Court of Georgia

Decided:   June 6, 2016

S16A0103.  DAVIS v. THE STATE.

NAHMIAS, Justice.

Appellant Sean Ohifemi Davis challenges his convictions for felony murder and first-degree child cruelty in connection with the death of his girlfriend's 13-month-old daughter, Nila Faye Flagler.  As explained below, we reject Appellant's contention that his trial counsel provided ineffective assistance, and we affirm his conviction and sentence for felony murder. However, the trial court should have merged the child cruelty count into the felony murder conviction for sentencing purposes, so we vacate Appellant's conviction and sentence for child cruelty.[1]

---

[1] The victim died on April 29, 2009.  On September 3, 2009, a Toombs County grand jury indicted Appellant for malice murder, felony murder based on first degree child cruelty, and first degree child cruelty.  At a trial from June 10 to 13, 2013, the jury acquitted Appellant of malice murder but found him guilty of the other two charges.  The trial court sentenced him to serve life in prison for felony murder and a concurrent term of 20 years for child cruelty; as explained in Division 1 (b) below, the latter sentence was improper.  On June 21, 2013, Appellant filed a motion for new trial, which he amended with new counsel on July 15, 2013.  The trial court held an evidentiary hearing on October 23, 2014, and entered an order denying the motion on June 19, 2015.  Appellant filed a timely notice of appeal, and the case was docketed in this Court for the January 2016 term and submitted for decision on the briefs.

1. (a) Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On April 27, 2009, Appellant came to Morrisha McLain's apartment in Vidalia, Georgia around 9:30 p.m. Appellant and McLain had been dating for a month or so, and he often cared for her children – Nila and her three-year-old brother Amari – while McLain worked the night shift at a nearby convenience store. Around 11:40 p.m., McLain left for work, and Appellant stayed with the children; Nila appeared healthy when McLain left. At about 7:40 a.m. the next morning, Appellant called McLain and told her that Nila was barely breathing and looked like she was having a seizure. McLain left work, calling 911 as she rushed home. When she arrived, she found Nila lying propped up on pillows on her bed; she was not breathing, and McLain started CPR. Moments later, an ambulance arrived, and Nila was taken to a nearby hospital, but she remained unconscious and required assistance to breathe. The child was flown to a hospital in Savannah, where she died the following day.

The medical examiner who performed Nila's autopsy testified at trial that the child had 26 external injuries on her head and face, including hair loss, abrasions, bruises, and healing lesions; several other external bruises and

2

abrasions on her back and legs; and several internal injuries, including a skull fracture, subgaleal and subdural hemorrhages, brain swelling, and ruptured blood vessels. The injuries to Nila's skull and brain caused her death.

Three of the doctors who treated Nila in Savannah testified that the injuries that led to her death resulted from a recent impact or back-and-forth movement and not from earlier accidental falls as Appellant's counsel suggested on cross-examination. Dr. John Devaro, a pediatric ophthalmologist, testified that Nila had hemorrhaging in her eyes and detached retinas from a large acceleration-deceleration injury, which indicated a direct hit from something or back-and-forth movement of the head that did not result from a fall off furniture. Dr. Deborah Conway, the director of pediatric imaging, testified that Nila's injuries resulted from a combination of blunt force to the head and shaking and not from falling off furniture, that Nila and her brother could not have caused her injuries, and that her injuries had occurred within a day of her arrival at the hospital. Dr. Donna Evans, a pediatrician and medical director of the hospital's child protection team, testified that Nila's injuries resulted from acceleration-deceleration impact trauma and could not have resulted from an accidental fall off furniture, and that Nila's symptoms would have been immediately apparent

3

to her caretaker.

Appellant testified that he did not strike, shake, or otherwise hurt Nila, claiming not to know how she was injured. Defense counsel elicited testimony from Appellant and McLain that a few days before Nila stopped breathing, she fell off her bed and got wedged between the bed and the wall with her head resting on the floor; she was in that position long enough to cause a clump of her hair to fall out when Appellant found her. On another occasion, Appellant and McLain were lying in bed together when Nila started to climb onto the bed but fell off, striking her head on the floor, although she got up laughing. Appellant also presented expert testimony from a pediatric forensic pathologist, Dr. Janice Ophoven, who asserted that prior accidental falls could have resulted in Nila's injuries and death. In rebuttal, the State called forensic pathologist Dr. Jamie Downs, who testified that Nila's injuries occurred less than a day before her death based upon their severity and lack of healing and could not have resulted from an earlier fall.

(b) Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude

4

that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder and first-degree child cruelty. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)). The trial court therefore properly entered a conviction and imposed a sentence on the felony murder charge. The court erred, however, in entering a judgment of conviction on the child cruelty count, because that charge was the predicate for Appellant's felony murder conviction. See Nazario v. State, 293 Ga. 480, 486 (746 SE2d 109) (2013); Higuera-Hernandez v. State, 289 Ga. 553, 554 (714 SE2d 236) (2011). Accordingly, we vacate Appellant's conviction and sentence for child cruelty.

2.     Appellant contends that he received ineffective assistance of trial counsel in three respects. To establish that his trial counsel was constitutionally ineffective, Appellant must prove both deficient performance by counsel and resulting prejudice. See Strickland v. Washington, 466 U.S. 668, 687 (104 SCt

5

2052, 80 LE2d 674) (1984). To show that his lawyer's performance was deficient, Appellant must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. This is no easy showing, as the law recognizes a "strong presumption" that counsel performed reasonably, and Appellant bears the burden of overcoming this presumption. Id. at 689. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. See Humphrey v. Nance, 293 Ga. 189, 192 (744 SE2d 706) (2013). In particular, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Reed v. State, 294 Ga. 877, 882 (757 SE2d 84) (2014).

Even when a defendant has proved that his counsel's performance was deficient in this constitutional sense, he also must prove prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough to show that the errors had some conceivable effect on the

6

outcome of the proceeding." Harrington v. Richter, 562 U.S. 86, 104 (131 SCt 770, 178 LE2d 624) (2011) (citation and punctuation omitted). Rather, Appellant must demonstrate a "reasonable probability" of a different result, which, the United States Supreme Court has explained, is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The reviewing court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. In all, the burden of proving a denial of effective assistance of counsel is a heavy one, see Wells v. State, 295 Ga. 161, 164 (758 SE2d 598) (2014), and Appellant has failed to carry that burden.

(a) Appellant first claims that his trial counsel was deficient in failing to properly invoke the so-called "rule of sequestration" in regard to Appellant's expert witness, Dr. Janice Ophoven, and the State's rebuttal expert, Dr. Jamie Downs.

(1) Due to a busy practice and poor health, Dr. Ophoven was unable to travel from her home in Canada to give live testimony at Appellant's trial. By agreement of the parties, her testimony was video recorded

7

on the first day of trial after the jury had been excused for the day; the recording was then played for the jury on the third day of trial. Dr. Ophoven testified that accidental falls between two and four feet could result in fatal injuries to a child that might not become apparent until days later, asserting that the scientific literature supported her position. She also testified that there is no scientific basis for the theory that the combination of retinal hemorrhaging, subdural hematoma, and brain damage necessarily shows that the child was violently shaken.

At some point before Dr. Ophoven's testimony was played for the jury, the prosecution gave a copy of the recording to Dr. Downs, who testified in rebuttal right after the jury watched Dr. Ophoven's testimony. The rule of sequestration had not been invoked by either party or by the court up to that point in the trial, although with the exception of Dr. Downs, the parties had honored the rule. After Dr. Downs was qualified as an expert, but before he offered his opinions, Appellant's counsel objected that the rule had been violated. The resulting sidebar discussion was not transcribed, but the trial court overruled the objection. Dr. Downs then offered his opinion about the cause of Nila's death, which was based on his review of the victim's medical and autopsy

8

records and other information he had been provided about the case, and identified where he disagreed with specific portions of Dr. Ophoven's analysis and conclusions.

After the jury was excused for the day, Appellant's counsel renewed the sequestration objection, but the court again overruled it, finding that Dr. Ophoven had not produced an expert report, so the only way for Dr. Downs to rebut her testimony was for him "to either know what the witness said in the courtroom or have someone summarize it for him so that he would know what her findings and conclusions were."[2] The court also found that Appellant was not at any disadvantage and asserted that trial courts have broad discretion in allowing witnesses to testify in rebuttal even when the rule of sequestration had been invoked and enforced.

_____

[2] In her trial testimony, Dr. Ophoven said that she does not prepare a report unless one is formally requested, but it is her policy in every case where a report is not prepared to make herself available to opposing counsel to discuss her findings and conclusions before trial; she denied the prosecutor's suggestion that the State had tried unsuccessfully to make contact directly with her before Appellant's trial. At the motion for new trial hearing, one of the prosecutors testified that not only did Dr. Ophoven fail to provide an expert report, but the State had repeatedly attempted to make contact with her prior to trial but was rebuffed each time. Dr. Ophoven did not testify at the motion for new trial hearing. See generally OCGA § 17-16-4 (b) (2) (requiring the defendant to disclose to the prosecution before trial certain expert reports).

(2)     Appellant's trial took place in June 2013, more than five months after Georgia's new Evidence Code took effect.  In our new evidence scheme, the rule relating to sequestration ("exclusion") of witnesses is found in OCGA § 24-6-615, which says:

> Except as otherwise provided in Code Section 24-6-616, at the request of a party the court shall order witnesses excluded so that each witness cannot hear the testimony of other witnesses, and it may make the order on its own motion.  This Code section shall not authorize exclusion of:
> (1)     A party who is a natural person;
> (2)     An officer or employee of a party which is not a natural person designated as its representative by its attorney; or
> (3)     A person whose presence is shown by a party to be essential to the presentation of the party's cause.[3]

The text of § 24-6-615 differs significantly from the text of the sequestration provision of the old Evidence Code,[4] and instead tracks in pertinent part the language of Federal Rule of Evidence 615 as that rule read in 2011.  As we have

---

[3]  OGGA § 24-6-616 says, "Subject to the provisions of Code Section 17-17-9 [elaborating on a crime victim's right to be present during court proceedings], the victim of a criminal offense shall be entitled to be present in any court exercising jurisdiction over such offense."

[4]  Former OCGA § 24-9-61 said:

Except as otherwise provided in [former] Code Section 24-9-61.1 [relating to crime victims], in all cases either party shall have the right to have the witnesses of the other party examined out of the hearing of each other.  The court shall take proper care to effect this object as far as practicable and convenient, but no mere irregularity shall exclude a witness.

explained before, to the extent that the new Georgia evidence rules deviate from the old Evidence Code and borrow from the text of the federal evidence rules in this way, we look for guidance to the decisions of the federal appellate courts, particularly the United States Supreme Court and the Eleventh Circuit, interpreting the federal rules in question. See Olds v. State, Case No. S15G1610, slip op. at 7 (decided May 23, 2016). See also Parker v. State, 296 Ga. 586, 592 (769 SE2d 329) (2015).[5]

Eleventh Circuit precedent explains that "[t]he purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." Miller v. Universal City Studios, Inc., 650 F2d 1365, 1373 (5th Cir. July 23, 1981).[6] See also Fed. R. Evid. 615 advisory committee notes on 1972 proposed rules ("The efficacy of excluding or sequestering witnesses has long been recognized as a

---

[5] As we noted in Parker, the general restyling of the Federal Rules of Evidence that took effect in December 2011, after our new Evidence Code was signed into law in May 2011, was intended to be stylistic only and not to change the result of any ruling on the admissibility of evidence. See 296 Ga. at 592 n.10. Accord Fed. R. Evid. 615 advisory committee notes on 2011 amendments.

[6] The Eleventh Circuit has adopted as binding precedent all decisions of its predecessor Fifth Circuit issued prior to October 1, 1981. See Bonner v. City of Pritchard, 661 F2d 1206, 1207 (11th Cir. 1981) (en banc).

11

means of discouraging and exposing fabrication, inaccuracy, and collusion."). The reasons for sequestration apply not only to a witness who is present in court to hear the testimony of other witnesses, but also – as essentially occurred here – to a witness's being given a transcript of another witness's trial testimony to review. See Miller, 650 F2d at 1373.

But there are exceptions to the sequestration rule. As relevant here, both OCGA § 24-6-615 (3) and Federal Rule of Evidence 615 (c) preclude trial courts from excluding a witness whose presence a party shows is "essential" to presenting that party's case. The trial court has broad discretion in deciding whether a witness comes within this exception. See Opus 3 Ltd. v. Heritage Park, Inc., 91 F3d 625, 629 (4th Cir. 1996). See also United States v. Ratfield, 342 Fed. Appx. 510, 512 (11th Cir. 2009); United States v. Jackson, 60 F3d 128, 134-135 (2d Cir. 1995).

The federal circuits agree that expert witnesses are not automatically excepted from sequestration as "essential"; that determination remains in the trial court's discretion. See, e.g., Miller, 650 F2d at 1373-1374; Opus 3, 91 F3d at 629. But the drafters of the federal rule recognized that the "essential" witness category would include "an expert needed to advise counsel in the

12

management of the litigation." Fed. R. Evid. 615 advisory committee notes on 1972 proposed rules.[7] In addition, federal courts have explained that the concerns underlying sequestration are generally overcome where an expert witness will give only or primarily opinion rather than factual testimony and may appropriately base that opinion on the testimony of other witnesses. See, e.g., Morvant v. Construction Aggregates Corp., 570 F2d 626, 629 (6th Cir. 1978) ("We perceive little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case."); United States v. Forehand, 943 FSupp.2d 1329, 1331-1332 (M.D. Ala. 2013) (ruling that the government's securities law expert could remain in the courtroom to base his opinions on the testimony of the 60 alleged victim investors); Skidmore v. Northwest Engineering Co., 90 FRD 75, 76 (S.D. Fla. 1981) (rejecting the exclusion of an expert witness from a deposition where the "expert testifies to his opinion, not to contested facts"). Compare Opus 3, 91 F3d at 629 (affirming a ruling that a witness was not exempt under Rule 615 where he was not just an expert but also a critical fact witness); Miller, 650 F2d at 1374 (indicating that

---

[7] We note that Dr. Downs does not seem to be in this category, as there is no indication that he was used by the prosecutors to advise them, for example, on how to question witnesses about medical matters.

13

an exemption would be "questionable" where a literary expert was to testify only about the two literary works at issue).

This view rests in part on the recognition that OCGA § 24-7-703, like Federal Rule of Evidence 703, allows expert witnesses to base their opinions on facts or data "perceived by . . . the expert at . . . the hearing."[8]  See also Fed. R. Evid. 703 advisory committee notes on 1972 proposed rules (explaining that instead of responding to a hypothetical question, "the expert [may] attend the trial and hear the testimony establishing the facts").  Indeed, having the expert attend the relevant parts of the trial may render unnecessary the lengthy, convoluted, and typically argumentative hypothetical questions that lawyers would otherwise utilize.  See Blake v. Kemp, 758 F2d 523, 550 n.27 (11th Cir. 1985) (Tjoflat, J., dissenting).  See also Forehand, 943 FSupp.2d at 1332 (noting

---

[8]  OCGA § 24-7-703 says:

The facts or data in the particular proceeding upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Such facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

that, "to the extent the purpose behind Rule 615 (a witness knowing what another witness has said) is at issue in this case, there is not much difference between allowing [the expert] to remain in the courtroom and presenting hypothetical questions to him: in both scenarios [he] would learn the testimony of another witness").

The reasons for sequestration may be even less applicable to rebuttal testimony by experts. While not excepted per se from sequestration,

> the very function of a rebuttal witness is directed toward challenging the prior testimony of opposing witnesses, thereby enhancing the fact finder's ultimate determination of an objective "truth." While not all rebuttal witnesses need be apprised of prior testimony – impeachment witnesses called to demonstrate bias, for example, – a rebuttal witness presented to refute the medical findings of an opposing expert can contribute most completely to a jury's truth finding capacity only by fully understanding and addressing all of the relevant prior evidence. Cf. United States v. Burgess, 691 F.2d 1146, 1157 (4th Cir. 1982) (holding that government psychiatrists should be allowed to hear testimony of opposing expert witnesses in order to completely familiarize themselves with each other's findings). Whether such evidence is summarized in the form of a hypothetical question or exposed by prior review, rebuttal examination cannot be properly conducted without revealing, in some measure, the testimony which is subject to refutation. Moreover, trial by ambush and confoundment of rebuttal witnesses hardly advances the purported goals of reliability and trustworthiness. Id. (it is unreasonable to place experts under short time constraints for familiarizing themselves with each other's findings and therefore, reasonable to permit all of them to appear in

15

court).

United States v. Bramlet, 820 F2d 851, 855 (7th Cir. 1987). See also United States v. Shurn, 849 F2d 1090, 1094 (8th Cir. 1988) (noting that "the purpose of a sequestration order is not applicable" to rebuttal testimony that is "not cumulative, but simply impeaching").

Finally, even when the rule of sequestration has been invoked and a witness violates it, the trial court may respond in at least three ways:

> (1) it may cite the guilty party for contempt; (2) it may allow opposing counsel to cross-examine the witnesses as to the nature of the violation; or (3) where counsel or the witness violate[s] the rule intentionally, the court may strike testimony already given or disallow further testimony. "The district court's denial of a mistrial for violation of the sequestration rule is . . . a matter of discretion and reversible only on a showing of prejudice."

United States v. Diaz, 248 F3d 1065, 1104 (11th Cir. 2001) (citations omitted). See also United States v. Ortega-Chavez, 682 F2d 1086, 1089-1090 (5th Cir. 1982) (finding no abuse of discretion or prejudice in allowing testimony of rebuttal fact witnesses who had violated a sequestration order).

(3) Viewed against this legal backdrop, under the circumstances of this case the trial court did not abuse its broad discretion in allowing Dr. Downs to testify in rebuttal of Dr. Ophoven based in part on his

16

review of her recorded testimony. Dr. Downs was entitled to know of her opinions and the bases for them, and where the defense had not provided an expert report and the court could find that the defense had rebuffed the State's efforts to contact her before trial, that information was reasonably conveyed to Dr. Downs by means of the recording rather than through a summary by someone who had viewed the recording or through hypothetical questions. Accordingly, even if Appellant's counsel had invoked the rule of sequestration earlier in the trial, the court would not have abused its discretion in excepting Dr. Downs from the rule to the limited extent that he was excepted. Appellant therefore has not shown that his trial counsel acted deficiently in this respect, nor has he shown that, but for counsel's actions, the outcome of the trial would have been different. See Hampton v. State, 282 Ga. 490, 492 (651 SE2d 698) (2007) (holding that trial counsel's failure to raise a meritless objection does not constitute deficient performance and causes no prejudice). As to prejudice, we also note that Appellant has failed to establish how Dr. Downs's testimony would have been different, and more favorable to him, if Dr. Downs had not seen Dr. Ophoven's testimony directly but rather had been asked hypothetical questions based upon the content of that testimony.

17

(b)  Appellant next argues that his trial counsel was professionally deficient in failing to object to the admission of two sets of photographs on the ground that they were duplicative and more prejudicial than probative. This argument implicates another provision of the new Evidence Code, OCGA § 24-4-403, which says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

OCGA § 24-4-403 mirrors Federal Rule of Evidence 403 and is interpreted accordingly. See Hood v. State, Case No. S16A0064, slip op. at 15 (decided May 23, 2016). The trial court's discretion under § 24-4-403 must be exercised with the understanding that exclusion of evidence under this rule "is an extraordinary remedy which should be used only sparingly." State v. Jones, 297 Ga. 156, 164 (773 SE2d 170) (2015) (citing United States v. Merrill, 513 F3d 1293, 1301 (11th Cir. 2008)) (quotation marks omitted).

Appellant first contends that his trial counsel should have objected to a series of 11 post-incision autopsy photos of the victim that the medical examiner and other State's experts used in explaining their opinions about the victim's

18

injuries and the cause of her death. Appellant argues that these photos were not material to any issue in the case, because the cause of death was not in dispute and was established by other evidence. In fact, the cause of the victim's death and the circumstances surrounding her injuries were the principal dispute at trial. The State presented evidence that Appellant caused the victim's fatal injuries after the child's mother left for work, while Appellant presented his own testimony that he did not strike, shake, or otherwise harm the victim along with expert testimony that the child's death could have resulted from earlier falls. Thus, the premise of Appellant's claim is faulty.

Moreover, a lawyer is not required to make an objection that he reasonably believes will fail. See Premo v. Moore, 562 U.S. 115, 124 (131 SCt 733, 178 LEd2d 649) (2011). And if Appellant's counsel had objected to the admission of these photos, the trial court would have been well within its discretion under OCGA § 24-4-403 in overruling the objection and admitting the photos. See, e.g., Dailey v. State, 297 Ga. 442, 444 (774 SE2d 672) (2015) (affirming the admission of autopsy photos over a § 24-4-403 objection, explaining that such photos are relevant when used by the medical examiner to show internal injuries that caused the victim's death, even if the defendant did

19

not dispute the cause of death); <u>United States v. Greatwalker</u>, 356 F3d 908, 912-913 (8th Cir. 2004) (explaining that a trial court may admit autopsy photos to be "used as aids in a medical examiner's testimony to explain the nature and extent of [the victim's] injuries and the cause of [his] death"). Thus, Appellant has not shown that his trial counsel was deficient in not objecting to these photos based on § 24-4-403, and he has not shown that there is a reasonable probability that such an objection would have changed the outcome of his trial. See <u>Hampton</u>, 282 Ga. at 492.

Appellant also contends that his trial counsel should have objected to a series of 12 photos from the hospital in Savannah where the victim died. Eight of these photos depict portions of the victim's body as she lay in a crib attached to various monitors and life support machines, and one photo appears to be of an MRI scan of the victim's head. These photos were relevant to show the nature and extent of the victim's injuries, and they are not especially gory or gruesome. See <u>Moss v. State</u>, 298 Ga. 613, 617-618 (783 SE2d 652) (2016) (discussing the admissibility under OCGA § 24-4-403 of pre-incision autopsy photos of a murder victim, based on Eleventh Circuit case law). Thus, it was not unreasonable for Appellant's counsel to think that these photos would have been

20

admitted even over an objection based on § 24-4-403, and counsel was not deficient in failing to make such an objection. See id.

Three photos from the hospital series are different. They do not depict the victim at all; two simply show medical equipment, and one is of a doll lying in the victim's crib. Unlike the other photos in dispute, we do not see – and the State has not offered an explanation for – how these three photos were relevant to any issue of consequence in this case. See OCGA § 24-4-401 (defining "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Thus, an objection to these photos based on OCGA § 24-4-403 might well have been sustained. See Hood, slip op. at 20-21. See also Old Chief v. United States, 519 U.S. 172, 178-185 (117 SCt 644, 136 LE2d 574) (1997) (discussing the interaction of Federal Rules of Evidence 401 and 403).

Nevertheless, we are confident that no Strickland prejudice resulted from the admission of these three photos. Cf. Hood, slip op. at 21-22 (concluding that the admission of other acts evidence in violation of OCGA § 24-4-403 was harmless error). The record indicates that these three photos were only

21

momentarily published to the jury along with more than six dozen other photos from the crime scene and hospital that were admitted during the testimony of the investigating officer; the State's other witnesses, including its experts, never mentioned these three photos; and the State did not refer to them in closing argument. Moreover, the other evidence against Appellant was strong, and from the evidence of the crime scene and the treating doctors, it was no secret to the jury that the victim was a very young child who suffered grievous injuries and then was subjected to life-saving measures at the Savannah hospital. Accordingly, Appellant has failed to show a reasonable probability that the result of the trial would have been different even if his counsel had objected to these three photos and the trial court had excluded them from evidence under OCGA § 24-4-403.

(c)    Finally, Appellant asserts that his trial counsel was ineffective in failing to more thoroughly research the State's medical experts. Appellant has not identified any specific shortcomings, however, and the record shows that counsel extensively cross-examined the State's experts and also found an expert who testified in Appellant's favor. Moreover, at the motion for new trial hearing, Appellant failed to present any evidence as to what further research

22

would have revealed or how any additional information would have improved his position. See <u>Domingues v. State</u>, 277 Ga. 373, 374 (589 SE2d 102) (2003) (holding that a defendant cannot show prejudice based on his trial counsel's alleged failure to thoroughly investigate the case without offering at least a proffer as to what additional investigation would have uncovered). It is not enough to speculate that such information exists and would have made a difference. See <u>Ballard v. State</u>, 297 Ga. 248, 254 (773 SE2d 254) (2015). Indeed, Appellant did not even ask his trial counsel about this issue at the motion for new trial hearing. Thus, Appellant has not shown that he received ineffective assistance of counsel in this respect either.

3. A final important note. As discussed previously, this case was tried under our State's new Evidence Code, and the key evidence rules we must apply – OCGA §§ 24-6-615 and 24-4-403 – differ from the pertinent provisions of the old Evidence Code and instead track the analogous federal evidence rules, meaning that we will look to those federal rules and the federal case law interpreting them for guidance. Nevertheless, in their briefs to this Court, Appellant cited § 24-6-615 only in passing and failed to cite § 24-4-403; the State cited neither new rule; and neither party cited any case law interpreting

23

these provisions of the new Evidence Code or the parallel provisions of the Federal Rules of Evidence.

It may be that the result of this case would be the same if we applied the old Evidence Code and our decisions interpreting it, but if so, that is happenstance, at least without careful comparison of the old and new law.[9] Georgia lawyers do this Court no favors – and risk obtaining reversible evidence rulings from trial courts – when they fail to recognize that we are all living in a new evidence world and are required to analyze and apply the new law. It may be hard to comprehend that, when it comes to trials and hearings held after January 1, 2013, the most pertinent precedent to cite on an evidentiary issue may be a decades-old decision of the Eleventh Circuit (or even the old Fifth Circuit), instead of a week-old unanimous decision of this Court (if we were deciding the appeal of a case tried before 2013 and governed by the old rules, as still

---

[9] Compare, e.g., Rivers v. State, 296 Ga. 396, 403 (768 SE2d 486) (2015) (noting that a prior inconsistent statement of a witness who testifies and is subject to cross-examination is admissible both to impeach the witness and as substantive evidence under both the new and old Evidence Codes), with, e.g., Brooks v. State, ___ Ga. ___, ___ (783 SE2d 895, 900) (2016) (reversing a murder conviction due to the trial court's improper admission of other act evidence under OCGA § 24-4-404 (b), in part because "'course of conduct,' . . . formerly an integral part of our law of evidence, [has] been eliminated from the new Evidence Code" (citation omitted)).

24

frequently occurs).[10]  We trust that this shortcoming will not be repeated in future cases coming to this Court.

Judgment affirmed in part and vacated in part.  All the Justices concur.

---

[10] To help avoid such misunderstandings, we often note the date of the trial in footnote 1 of our opinions and try also to note when we are applying a no-longer-existing evidence rule.