NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 21, 2026

S25A1261.  STAPLETON v. THE STATE.

WARREN, Presiding Justice.

Appellant Calvin Stapleton was convicted of malice murder in connection with the shooting death of Andre Taylor.[1]  On appeal, Stapleton contends he is entitled to a new trial because the bailiffs at his trial were unsworn; his trial counsel rendered ineffective

---

[1] Taylor was shot and killed on April 3, 2017.  In June 2017, a Bibb County grand jury indicted Stapleton for malice murder, felony murder predicated on aggravated assault, aggravated assault, and three violations of the Street Gang Terrorism and Prevention Act (Gang Act).  At a jury trial in August 2018, the jury found Stapleton guilty of malice murder, felony murder, and aggravated assault, but found him not guilty of the three Gang Act counts. Stapleton was sentenced to life in prison without the possibility of parole for malice murder, and the trial court merged the felony murder and aggravated assault counts.  Stapleton timely filed a motion for new trial in August 2018 and amended it several times through new counsel, most recently in November 2024.  In February 2025, the trial court amended Stapleton's sentence, recognizing that the felony murder count was vacated by operation of law rather than merged, and denied his motion for new trial.  Stapleton filed a timely notice of appeal, and his appeal was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

assistance by failing to object to the admission of post-incision autopsy photographs and evidence of his prior conviction; and the trial court erred by denying his requested jury instruction on voluntary manslaughter. For the reasons explained below, we affirm.

1. The evidence presented at trial showed the following. Despite belonging to rival gangs in Macon, Taylor—a leader of the Westside Gangster Crips—and Stapleton—a member of the Gangster Disciples—were "homeboys" from the same neighborhood. On the evening of April 2, 2017, Stapleton visited Taylor's "bootleg" bar, where the two got into an "altercation." Stapleton went to the hospital that night with an arm injury.

The next day, several members of the Westside Gangster Crips, including Sheldon Beard, were socializing in the vestibule of a convenience store that was known as a "Crip hangout" in Macon. Surveillance video from the convenience store showed that Taylor eventually arrived in his car and went inside. Stapleton, who was wearing a black shirt, blue jeans, and had his arm in a sling, entered

the parking lot on foot shortly thereafter. Beard testified that he tried to go into the parking lot to talk with Stapleton, but Taylor told him not to and that Taylor would "go talk to him" instead.

Surveillance video captured Taylor exiting the store, adjusting his waistband, and approaching Stapleton, who initially backed away from Taylor before walking with him across the parking lot. Beard testified that although he did not know what Taylor and Stapleton were discussing during their "walk and talk" across the parking lot, it appeared "normal" and "no[t] heated." After walking for approximately 50 seconds, the pair arrived at the opposite end of the parking lot and stopped near a dumpster, where they continued talking.

A gray sedan pulled next to the men, and Taylor bent over to speak with its passengers. He stood up and spoke briefly with Stapleton again, who was by then behind the dumpster and out of the camera's view, before bending back down to speak with the passengers of the sedan. Approximately 10 seconds later, Stapleton emerged from behind the dumpster and shot Taylor in the back of

the head. Taylor immediately fell to the ground, and the gray sedan sped away.

A witness saw Stapleton "walk[] fast" across the street and tuck a gun into his back pocket. Beard ran after Stapleton but was unable to catch him. Surveillance video showed that over the next approximately seven minutes, several cars and people surrounded Taylor's body in the parking lot. Taylor was then taken by ambulance to the hospital, where he died.[2]

That evening, Stapleton, still wearing a black shirt and blue jeans, went to the police station on his own accord to speak with investigators. Investigator Robert Shockley conducted an interview of Stapleton, which was recorded and played for the jury. During the interview, Stapleton told Investigator Shockley that he went to the station because people on Facebook were suggesting Stapleton killed Taylor. After discussing the incident at Taylor's "bootleg" bar from the evening prior, which Stapleton claimed occurred "because

---

[2] The medical examiner testified that "the bullet passed through the cerebellum and the cerebrum, which [was] a devastating fatal injury to the brain, and Mr. Taylor died as a result of this significant brain injury."

4

[he] was asking for a beer," Stapleton assured Investigator Shockley that he did not shoot Taylor; instead, he simply saw and heard the shooting but did not know who the shooter was.  After Investigator Shockley told Stapleton that surveillance video showed he was the shooter, Stapleton maintained that he was not, asked for a lawyer, and was placed under arrest.

At trial, Stapleton testified in his own defense as follows.  He shot Taylor, but did so "out of fear" and in "self-defense" because he was "scared for [his] life."  Stapleton had known Taylor for "25 years, 20 years, something like that," and prior to the altercation at Taylor's "bootleg" bar, the two never had any issues.  At the bar, Stapleton "went … to get a beer," but he was "something like $0.50 short."  Taylor told him he could not have the beer and to "get out."  When Stapleton was not "leaving fast enough," Taylor "got a couple of his boys … to try to push [Stapleton] out."  Taylor "came with a big log swinging and broke [Stapleton's] arm." The next day, Stapleton arrived at the convenience store "to get [himself] a soda." As he approached the store, Taylor emerged from the store "at full

5

speed," looked "very angry," and "pulled his gun from his waist."[3] Taylor told him that he could not enter the store, and they began "walking and talking" across the parking lot. Taylor told Stapleton that he could not "come around this area no more," cursed at him, and called him "all types of names." Once the pair made their way to the other side of the parking lot, a gray sedan arrived, and Taylor told its occupants to "run over" Stapleton if he tried to get away and that Taylor would "kill [Stapleton] if [he tried] to go in the store." Stapleton felt as though he could not leave, because he would be "run over," but also that he could not stay, because he would be killed by Taylor or his friends in the store. Stapleton walked away briefly and located a pistol behind the dumpster in the parking lot. He then "took it upon [himself]" and shot Taylor. According to Stapleton, as he fled the scene, Beard shot at him; Stapleton dropped the gun; and

---

[3] During the trial, Stapleton's counsel showed three law enforcement witnesses a still image from surveillance video of Taylor exiting the convenience store. When asked whether it looked like he had a gun, each answered indecisively. However, Beard and the State's gang expert testified that Taylor was not known to carry a weapon, and investigators did not find one on his body.

Beard took it.  Stapleton admitted lying to the investigator about shooting Taylor, but claimed he did so because "at the time [he] was trying … to get out of it."

2.  Stapleton first contends that he is entitled to a new trial because the bailiffs at his trial were not sworn.  As explained more below, this claim fails.

Under Georgia law, bailiffs are required to swear an oath before taking charge of a jury at trial.  See OCGA § 15-12-140.[4]  We have long held that the "[f]ailure of a bailiff to take the oath … is ground for the grant of a new trial." *Jackson v. State*, 152 Ga. 210, 210 (1921).  See also, e.g., *Hannah v. State*, 212 Ga. 313, 320–24

---

[4] OCGA § 15-12-140 provides:
The following oath shall be administered to all bailiffs on duty in any court in this state conducting a jury trial:
"You shall take all juries committed to your charge to the jury room or some other private and convenient place designated by the court and you shall not allow the jurors to receive any books, papers, nourishment, or hydration other than water, or to use any electronic communication device except as directed and approved by the court.  You shall make no communication with the jurors nor permit anyone to communicate with the jurors except as specifically authorized by the court.  You shall discharge all other duties which may devolve upon you as bailiff to the best of your skill and power.  So help you God."

(1956); *Roberts v. State*, 72 Ga. 673, 678 (1884). "But, where bailiffs take charge of juries, there is a presumption that they were regularly sworn[.]" *Jackson*, 152 Ga. at 210. To rebut that presumption, an appellant must point to affirmative evidence that the bailiffs at his trial were not sworn. See id. See also *Arnold v. State*, 250 Ga. App. 461, 461 (2001) (acknowledging that an appellant bears the "burden of showing affirmatively that his bailiff was not sworn"). Indeed, the presumption cannot be rebutted by "mere negative testimony," such as that of the bailiff that "he had no recollection of taking the oath, and of others who were present … in the courtroom that they had no recollection of seeing him sworn[.]" *Jackson*, 152 Ga. at 210.

At the hearing on Stapleton's motion for new trial, Stapleton's trial attorneys testified that they could not recall whether they saw the bailiffs take the oath prior to trial. And neither the trial transcripts nor the court reporter's audio recordings, which were admitted into evidence at the motion for new trial hearing, indicate whether the oath was administered. Stapleton argues this

constitutes evidence sufficient to rebut the presumption that the bailiffs at trial were sworn.

We disagree. Neither the "negative testimony" of Stapleton's trial attorneys "that they had no recollection of seeing [the bailiffs] sworn," nor the absence of the oath from the transcripts and audio recordings affirmatively show that the oath had not been administered to the bailiffs such that they were not sworn before Stapleton's trial. See *Jackson*, 152 Ga. at 210 (concluding that "the mere negative testimony" of trial attendees that they could not recall whether the oath was administered, in addition to "the fact that there was no record … of the oath having been taken" did not affirmatively show that the bailiffs were not sworn). Compare *Hannah*, 212 Ga. at 319–20 (granting a new trial where a deputy sheriff took charge of jurors at trial and later testified that he had not taken the oath for bailiffs). Because Stapleton has failed to rebut the presumption that the bailiffs at his trial were sworn, his claim fails.

3. Stapleton contends that his trial counsel provided constitutionally ineffective assistance when they failed to object to the admission of post-incision autopsy photographs under OCGA § 24-4-403 ("Rule 403") and to evidence of his prior conviction under OCGA § 24-6-609 ("Rule 609"). Because trial counsel did not perform deficiently, these claims fail.

To prevail on his claims, Stapleton must establish that trial counsel's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Davis v. State*, 299 Ga. 180, 182 (2016). To prove deficient performance, Stapleton must show that his trial counsel "performed [their] duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Davis*, 299 Ga. at 182–83. "This is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably[.]" Id. at 183 (quotation marks omitted). Stapleton bears the burden of overcoming this presumption, and to do so "he must show that no reasonable lawyer would have done

10

what his lawyer[s] did, or would have failed to do what his lawyer[s] did not." Id. "In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. (quotation marks omitted). And failing to lodge "a meritless objection" is not deficient performance. *Lyons v. State*, 309 Ga. 15, 28 (2020). To prove prejudice, Stapleton must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Davis*, 299 Ga. at 183 (quotation marks omitted). We need not address both parts of the *Strickland* test if Stapleton does not meet his burden of establishing one. See *Strickland*, 466 US at 697; *Davis*, 299 Ga. at 183.

(a) Stapleton first argues that his trial counsel was deficient for failing to object to the admission of two post-incision autopsy photographs under Rule 403, which provides in pertinent part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"

11

Because such an objection would have been meritless, this claim fails.

During the medical examiner's testimony at trial, the State tendered two post-incision autopsy photographs. The first depicted the back of Taylor's skull and scalp, which the medical examiner used to explain "the hemorrhage in the soft tissue around the entrance gunshot wound." The second depicted the inside of Taylor's skull, which the medical examiner used to show "the inside portion of the skull defect" and explain how it was consistent with "an entrance gunshot wound to the skull." Stapleton's trial counsel did not object, and his lead trial attorney testified at the motion for new trial hearing that he did not think the photos were inflammatory or that an objection thereto would have had merit.

Stapleton claims that an objection to the photographs under Rule 403 would have been sustained because Taylor's cause of death was "immediately apparent" from pre-incision autopsy photographs and, to the extent internal examination was necessary, x-ray images that were also admitted would have been an equally probative and

less gruesome alternative.

We conclude that, although Taylor's cause of death was not disputed, the autopsy photographs were relevant and probative of the nature and location of his injuries. See OCGA § 24-4-401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); *Albury v. State*, 314 Ga. 459, 461 (2022) ("Autopsy photographs may be relevant and probative to show the nature and location of a victim's injuries, even if the cause of death is not disputed." (quotation marks omitted)). The medical examiner used the photographs to explain the bullet's entry into and path through Taylor's skull and the internal damage it inflicted. And although the x-ray images were less graphic, they could not show the severity of Taylor's injuries, which the medical examiner emphasized in explaining Taylor's cause of death. See *Flowers v. State*, 307 Ga. 618, 624 (2020) (determining a post-incision autopsy photograph of the decedent's brain was probative of the "severity" of

13

his injuries).  Further, the photographs were not "especially gory or gruesome in the context of autopsy photographs in a murder case," thus diminishing the danger of unfair prejudice.  *Pike v. State*, 302 Ga. 795, 799–800 (2018).  See also *Jackson v. State*, 317 Ga. 95, 102 (2023) ("The prejudicial effect of evidence is unfair if the evidence has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (quotation marks omitted)); *Davis v. State*, 306 Ga. 140, 145 (2019) ("[P]hotographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under Rule 403 merely because it is gruesome." (quotation marks omitted)).  Because the probative value of the photographs was high and the danger of unfair prejudice was minimal, the trial court "would have been well within its discretion under [Rule 403] in overruling the objection and admitting" the photographs.  *Davis*, 299 Ga. at 190 (concluding that trial counsel was not deficient for failing

to object to post-incision autopsy photographs under Rule 403 because the trial court would have been within its discretion to conclude the probative value of the photographs was not substantially outweighed by risks of unfair prejudice and overrule such an objection).  Consequently, Stapleton's trial counsel was not deficient for failing to object to this evidence, and this claim fails.

(b) Stapleton next argues that trial counsel was deficient for not objecting to evidence of one of his prior convictions under Rule 609, which provides in relevant part that, when more than 10 years have elapsed since the date of one's conviction or release from confinement, evidence of that conviction is inadmissible unless the "probative value of the conviction … substantially outweighs its prejudicial effect." Because Stapleton has not shown that no reasonable lawyer would have failed to make such an objection, this claim fails.

On direct examination, Stapleton testified that he had previously been convicted of drug charges.  On cross-examination, the State elicited testimony from Stapleton that he had been

15

convicted of possession of cocaine with intent to distribute in 2002. Stapleton's attorneys did not object. The State then tendered into evidence a certified copy of Stapleton's prior conviction without objection.[5] At the motion for new trial hearing, Stapleton's trial counsel testified that he "couldn't tell" why he did not object to evidence of the 2002 conviction but that he "should have."

Although Stapleton's trial counsel testified at the motion for new trial hearing that he could not recall a strategic reason for not objecting, trial counsel's failure "to articulate any strategic reasons for his failure to [object] makes no difference, because our inquiry is focused on the objective reasonableness of counsel's performance, not counsel's subjective state of mind" during trial. *State v. Tedder*, 305 Ga. 577, 584 (2019) (quotation marks omitted). "Reasonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal,"

---

[5] Immediately after introducing evidence of the 2002 conviction, the State introduced Stapleton's 2014 conviction for possession of cocaine and marijuana. On appeal, Stapleton does not challenge the admission of evidence of the 2014 conviction.

*Ballard v. State*, 297 Ga. 248, 254 (2015) (quotation marks omitted), and Stapleton has not argued, let alone shown, that "no reasonable lawyer would have … failed to" object to evidence of his 2002 conviction, *Davis*, 299 Ga. at 183. A reasonable lawyer could have had a strategic basis not to object to this evidence. For example, Stapleton had just testified on direct examination that he was previously convicted of more than one drug charge, so introduction of the 2002 conviction merely corroborated Stapleton's testimony. A reasonable lawyer could have concluded that allowing Stapleton to answer one question about the charges was a better strategy than potentially succeeding on an objection, particularly given the importance of Stapleton's credibility to his defense. See *Copney v. State*, 922 SE2d 43, 50 (2025) (concluding it was objectively reasonable, and thus not deficient, for counsel not to object to "older convictions" under Rule 609 based on "a desire to establish [the defendant's] credibility by having him admit to his prior crimes while denying the charges at issue"). Because trial counsel's failure to object was objectively reasonable, Stapleton has not shown that

17

counsel performed deficiently, and this claim fails.

4. Finally, Stapleton contends that the trial court erred in declining his request to instruct the jury on voluntary manslaughter. Because there was not even slight evidence to support such a charge here, the trial court did not err in declining to give it.

OCGA § 16-5-2(a) defines "voluntary manslaughter" as the killing of another person under circumstances that would otherwise be murder when the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" To warrant a jury charge on voluntary manslaughter, there must be at least slight evidence that "the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." *Beck v. State*, 310 Ga. 491, 496 (2020) (quotation marks omitted). "A charge on voluntary manslaughter is not available to a defendant whose own statement unequivocally shows that he was not angered or impassioned when a killing occurred, and

18

when the other evidence does not show otherwise." Id. at 497 (quotation marks omitted). "[A]cting out of fear of bodily harm is not the same as acting in the heat of passion, and only evidence of the latter supports a voluntary manslaughter conviction." *Burke v. State*, 302 Ga. 786, 790–91 (2018). See also *Morton v. State*, 306 Ga. 492, 496 (2019) ("The distinguishing characteristic between [self-defense and voluntary manslaughter] is whether the accused was so influenced and excited that he reacted passionately rather than simply in an attempt to defend himself." (quotation marks omitted)).

Here, Stapleton argues that his trial testimony supported the theory that Taylor's conduct on the night before the shooting—throwing Stapleton out of the "bootleg" bar and breaking his arm—and Taylor's conduct immediately preceding the shooting—flashing a gun at Stapleton and then threatening and berating him—amounted to a serious provocation that caused Stapleton to react passionately. But Stapleton "never testified that he was angry or mad or that he had any other response showing he might have reacted passionately." *Collins v. State*, 312 Ga. 727, 740 (2021).

19

Instead, he unwaveringly claimed that he shot Taylor "out of fear" and in "self-defense" because he was "scared for [his] life." Because the record does not reveal even the slight evidence required to support an instruction on voluntary manslaughter, we conclude that the trial court did not err in declining to give one. See id. (concluding that the trial court did not err in declining to give a voluntary manslaughter instruction where the victim pulled a gun on the defendant, threatened to kill him, and berated him, but the defendant never testified that he was angry, mad, or reacted passionately rather than in self-defense); *Browning v. State*, 283 Ga. 528, 529–31 (2008) (concluding that a voluntary manslaughter charge was not warranted where the defendant's "own testimony belie[d] the claim that he acted in the heat of passion" and instead "plainly attempted to portray that [he] shot [the victim] in order to protect himself").

*Judgment affirmed. All the Justices concur, except Colvin, J., disqualified.*