306 Ga. 579
FINAL COPY

S19A0818.  WALKER v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Rico Orlando Walker appeals his convictions for the murder of Steven Harley and related crimes, contending that he received ineffective assistance of counsel.[1] For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence shows that Tracey Harley, Steven's wife, met Walker in a Walmart parking lot in 2000 or 2001, exchanged numbers, and

---

[1] On June 12, 2006, Walker was indicted for malice murder, criminal attempt to commit murder, and tampering with evidence. Following a jury trial that took place on May 14-17, 2007, Walker was found guilty on all counts. The trial court sentenced Walker to life in prison for malice murder, ten years for criminal attempt to commit murder to be served consecutively to the malice murder sentence, and an additional five years for tampering with evidence to be served consecutively with the other sentences. Walker filed a motion for out-of-time appeal, which the trial court granted on January 17, 2012. Walker then filed a motion for new trial on January 20, 2012, which he amended on November 20, 2017 and July 17, 2018. Following a July 17, 2018 hearing, the trial court denied the motion for new trial on August 6, 2018. Walker timely filed a notice of appeal, and his case, submitted for a decision on the briefs, was docketed to the April 2019 term of this Court.

began a years-long affair. Eventually, as the relationship grew, Tracey and Walker discussed murdering Steven, though Walker did not tell Tracey the details of what he was planning in order to "protect" her. In the month before the murder, Tracey told Walker about Steven's daily routine and showed Walker where the home she shared with Steven was located. In addition, Tracey cashed a $1,500 check and gave the money to Walker, who was going to use the cash to hire someone who would help him with the murder.[2]

Walker originally planned to murder Steven on Friday, April 21, 2006. That day, Walker parked his truck outside Tracey's home, raised the truck's hood, and waited for Tracey to leave to take her child to school. After Tracey left, however, Walker called her and told her that he could not go through with the planned murder. After knocking on the door and telling Steven he was having car trouble, Walker decided that the murder would have to happen a different

---

[2] There was evidence that Walker may have planned to hire his cousin to assist in the murder, but that plan apparently fell through.

day.[3]

On April 24, 2006, Walker told Tracey that he would murder Steven that day. Walker texted Tracey, "I'm just so ready, baby. Miss you. Will be over soon, count on it." That night around 9:00 p.m., Walker and Tracey met at Walker's cousin's house. Walker got into Tracey's car with something wrapped in a sweatshirt, and the two of them drove to Tracey's home. Walker waited inside the car and instructed Tracey to come and get him after Steven fell asleep. Around 11:30 p.m., Tracey signaled Walker, who came inside the house carrying his "bundle." Walker told Tracey to make sure her two young children stayed in their room, and then Walker entered the master bedroom where Steven was sleeping. Tracey waited outside and heard the sounds of beating. Afterwards, Walker exited the bedroom with an axe handle. He told Tracey that Steven was "as good as gone" and that he had slit Steven's throat. Walker then

---

[3] That day, Steven reported the event to the sheriff's office, recounting that a suspicious white extended-cab Chevrolet truck had parked in his driveway that morning and two black males came up to his door and said their truck was broken down.

threw Tracey's jewelry on the floor, took Steven's wallet, and broke the back window with a hammer in order to make it seem like there had been a break-in. Walker told Tracey to "beat herself up," so she inflicted scratches on herself and cut her pajamas. Walker then took Steven's truck and left.

Forty-five minutes later, Tracey called 911 and frantically reported a home invasion. She said that two men came into the master bedroom while she and her husband were sleeping, and that one of the men attacked Steven. When officers arrived, they observed superficial scratches on Tracey's chest and noticed that her pajamas were torn. Steven was found lying on the floor of the bedroom with his throat cut from ear to ear. He had also been struck in the head three to four times while he was still in the bed, and he displayed no defensive wounds. In addition, a knife was found in the bedroom that matched the knives from the knife block in the kitchen, and, at the scene, a GBI special agent noticed a card from a florist shop in Tracey's purse addressed to Tracey from "Ric."

While being questioned by responding officers, Tracey received

4

several calls from Walker. This prompted a GBI special agent to contact Walker, who agreed to meet with the agent. At that meeting, Walker said that he had come to Burke County on April 24 to buy some lumber. Walker said that he spent time with his friends, and also with Tracey, with whom he admitted he was having an affair. Walker said that on the night of April 24, he met up with Tracey, they hung out at his cousin's house, and then she went home. Walker denied going to neighboring Jenkins County that day and said that he was not familiar with where Tracey lived in Jenkins County. He stated that, after Tracey left, he hung out at a friend's house, and then left around 12:30 to 1:00 a.m. to head back to his home in Hart County.

Contrary to Walker's statements, however, police obtained phone records and cell-site location information ("CSLI") that placed Walker in Millen (where the Harleys lived) around the time Steven was killed. Phone records also showed that, on the night of the murder, Walker and Tracey talked at 12:07 a.m., Walker called Tracey at 12:26 a.m., and then Tracey called Walker at 12:51 a.m.,

5

just minutes before calling 911. Tracey also sent Walker a text message while on the phone with the 911 operator between 12:54 a.m. and 1:07 a.m. Walker told the police that Tracey seemed completely "normal" during the 12:51 a.m. phone call to him. In the ten days leading up to Steven's death, Walker had over 1,300 calls and text messages, most of which were to or from Tracey. Walker was arrested on May 11, 2006, and Tracey was arrested shortly thereafter. Although Tracey initially denied knowing anything about the murder, she confessed following her arrest and described the murder plot in full detail. She also testified at Walker's trial.

The record also shows that, while Walker was in jail awaiting trial, he became friends with Emory Bell, another inmate. The two men confided in each other about their respective cases. Walker told Bell that he had had a sexual relationship with a school teacher and that he had killed her husband because she wanted her husband "out of the picture." Walker told Bell that he had slit the husband's throat and driven the husband's truck somewhere.

This evidence was sufficient to enable the jury to find beyond a

reasonable doubt that Walker was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).[4]

2. Walker contends that trial counsel rendered ineffective assistance by failing to: (a) move to suppress the CSLI used against him at trial; (b) object to certain evidence and statements allegedly commenting on his right to remain silent; and (c) impeach Bell with all of his former convictions.

> In order to succeed on his claim of ineffective assistance, [Walker] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. Id. at 697 (IV); *Fuller v. State*, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's decision, "'[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

---

[4] Although Walker does not challenge the sufficiency of the evidence in this case, it is our customary practice to review the sufficiency of the evidence in murder cases. See *Wainwright v. State*, 305 Ga. 63 (1) (823 SE2d 749) (2019).

7

*Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012). Furthermore, "[t]rial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014).

(a) Walker first contends that trial counsel rendered ineffective assistance by failing to object to the CSLI used to track his location at trial. Relying on *Carpenter v. United States*, ___ U. S. ___ (138 SCt 2206, 201 LE2d 507) (2018), Walker argues that trial counsel should have moved to suppress the CSLI on the basis that it was obtained through a court order rather than a warrant. *Carpenter* holds that individuals maintain a legitimate expectation of privacy in the record of physical movements captured by CSLI, and, accordingly, a search warrant supported by probable cause is generally required before acquiring CSLI from a wireless carrier. See id. at 2217 (III). *Carpenter*, however, was decided eleven years

8

after Walker was tried.

> [I]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law, and only in a rare case would it be ineffective assistance by a trial attorney not to make an objection that would be overruled under prevailing law. *Rickman v. State*, 277 Ga. 277, 280 (2) (587 SE2d 596) (2003). Although this Court has held that [a new decision] applies to the admission of evidence in cases pending on direct review at the time that opinion was issued, that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, [a new decision] does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued.

(Citation and punctuation omitted.) *Perera v. State*, 295 Ga. 880, 885-886 (3) (d) (763 SE2d 687) (2014). Thus, Walker's trial counsel could not be deemed ineffective for failing to argue precedent that was not in existence at the time of his trial.

Furthermore, Walker has not shown us that any objection to the CSLI would have been successful if one had been made. And, in fact, prior to the decision in *Carpenter*, our Court of Appeals held that CSLI was admissible. *Smarr v. State*, 317 Ga. App. 584 (732

9

SE2d 110) (2012).[5]

(b) Next, relying on *Mallory v. State*, 261 Ga. 625 (5) (409 SE2d 839) (1991), Walker contends that trial counsel was ineffective for failing to object to the admission of two separate comments that were allegedly made about his pre-arrest silence.

> Under Georgia's old Evidence Code, which governed the trial of this case, this Court established a bright-line rule [in *Mallory*[6]] prohibiting the State from commenting on a defendant's pre-arrest silence or failure to come forward, on the ground that such comments were far more prejudicial than probative.

(Citation and punctuation omitted.) *Kennebrew v. State*, 299 Ga. 864, 872 (2) (a) (2) (792 SE2d 695) (2016).

(i) The first comment challenged by Walker was introduced during the direct examination of Investigator Tom Woodrum, who

---

[5] Similar rulings can be found in federal courts. See, e.g., *United States v. Skinner*, 690 F3d 772, 779 (II) (A) (6th Cir. 2012) (because "cell-site data is simply a proxy for the defendant's visually observable location, and a defendant has no legitimate expectation of privacy in his movements along public highways, . . . DEA agents did not conduct a search within the meaning of the Fourth Amendment") (citation and punctuation omitted).

[6] For cases subject to the new Evidence Code, the *Mallory* rule is no longer applicable because it "is inconsistent with [OCGA § 24-4-403], and it finds no home in any of the specific and detailed exclusionary rules included in the new [Evidence] Code." *State v. Orr*, 305 Ga. 729, 738 (2) (827 SE2d 892) (2019).

questioned Walker shortly after the murder. Woodrum recounted that he asked Walker about cell phone data showing that he called Tracey right around the time of the 911 call on the night of the murder, and Walker responded that Tracey seemed calm at the time they were speaking. The following testimony was given at trial:

> INVESTIGATOR WOODRUM: Well, I confronted him . . . right then that I knew that there was a phone call between the two of them within moments of that 911 call. And how in the world could the [two] of them be on the phone discussing what had happened to Steve Harley when we knew that he was laying [sic] there on the floor dead. . . . You and Tracey are sitting there discussing things calmly but yet you tell me that he was laying [sic] there on the floor with his throat cut. That's what I said. And he couldn't respond.
> STATE: And you based that assertion on the call records and the time of death you knew that Steven had suffered.
> INVESTIGATOR WOODRUM: That's right[.]
> STATE: And what did he say?
> INVESTIGATOR WOODRUM: Nothing. He didn't say anything.
> STATE: And what was his demeanor?
> INVESTIGATOR WOODRUM: He was shocked. He kind of stared off like he was, you know, just taken aback by the whole thing and just kind of looked away, and I say I gave up on it.

Based on *Mallory*, Walker argues that Woodrum should not have been allowed to state that Walker did not say anything in response

11

to his question. Even if we assume without deciding that Woodrum's answer on direct examination violated the *Mallory* rule, and assume further that counsel had no strategic reason for not objecting, the evidence against Walker, including Tracey's testimony, texts, and Walker's admission to Bell, was overwhelming, so the answer caused no *Strickland* prejudice. See *Ruiz v. State*, 286 Ga. 146, 152 (3) n. 3 (686 SE2d 253) (2009). Consequently, Walker cannot show that he was prejudiced by trial counsel's failure to object to the testimony in question. Id.

(ii) The second comment Walker contends is objectionable was made by the prosecutor during closing arguments. Recounting Walker's testimony and demeanor when he was being examined at trial by his own lawyer, the prosecutor argued:

> [W]hen his attorney was going line after line and . . . he said, When you told her, baby, I'm lost without you. Sorry for not getting the job done. What did you mean by that? . . . Everybody here could hear a pin drop. Y'all were looking at him. [Walker's] head dropped and he couldn't give an answer . . . I could imagine that was the same kind of expression that [Walker] gave Mr. Woodrum when he said, [w]hat did y'all talk about for a hundred and thirty-nine seconds while Steven Harley was laying [sic]

12

dead in his bedroom. And he couldn't give an answer. *Because any answer that would have contained a shred of truth would be the answer of his guilt.*

(Emphasis supplied.) Even if we assume that the prosecutor's statement was objectionable and that trial counsel was deficient for failing to object, Walker must still prove that his defense was prejudiced. He has not carried this burden. Here,

> in light of the . . . strong evidence against [Walker], we see no reasonable probability that an objection to this [argument] would have produced a different and more favorable outcome for [Walker]. See *Blaine v. State*, 305 Ga. 513, 521 (4) (826 SE2d 82) (2019) ("[T]rial counsel cannot be ineffective for failing to raise claims that would not have . . . made any difference in the outcome of [the defendant's] case.").

*Spell v. State*, 305 Ga. 822, 826 (2) (828 SE2d 345) (2019).

(c) Finally, Walker maintains that trial counsel rendered ineffective assistance by failing to impeach inmate Bell with all of his former convictions, including one conviction for forgery that was over ten years old. Again, this contention fails.

> Under former OCGA § 24-9-84.1 (a) (1), (3) which is applicable to this case, prior felony convictions could be used to impeach a witness if the trial court determined that the probative value of admitting the evidence

13

outweighed its prejudicial effect to the witness. Id. Subsection (a) (3) permitted the use of any conviction for a crime involving dishonesty or making a false statement. Subsection (b) governed the use of convictions that, like [Bell's], were more than ten years old, and required the trial court to determine, "in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweigh[ed] its prejudicial effect."

(Footnote omitted.) *Clark v. State*, 299 Ga. 552, 555 (2) (b) (787 SE2d 212) (2016). At the motion for new trial hearing, Walker introduced certified copies of some of Bell's prior convictions and generally asked trial counsel about his strategy for not introducing them, but he did not attempt to show

that the probative value of [any prior] conviction supported by specific facts and circumstances substantially outweighed its prejudicial effect, and, as a result, he has failed to provide any basis for showing that the convictions would have been admissible and that he was harmed by his attorney's failure to introduce them.

Id. Walker makes a specific argument only in regard to Bell's prior forgery conviction, contending that it should be automatically admissible as a crime of dishonesty pursuant to former OCGA § 24-9-84.1 (a) (3). However, because that conviction was more than ten

14

years old, it would only be admissible if "the probative value of the conviction supported by specific facts and circumstances substantially outweigh[ed] its prejudicial effect," as required by former OCGA § 24-9-84.1 (b). Again, Walker has not shown this prerequisite for admissibility would have been satisfied.

Moreover, Walker's trial counsel did cross-examine Bell about the burglary charges he was facing at the time that he was Walker's prison mate, and he also asked Bell about former convictions for aggravated assault and battery.[7] Trial counsel then used these convictions to draw Bell's testimony into question during his closing argument. So, Bell's credibility was drawn into question, and Walker has made no showing as to how he may have been prejudiced by trial counsel's failure to offer any other prior convictions (even if we assume any such prior convictions might have been admissible).

*Judgment affirmed. All the Justices concur.*

---

[7] Trial counsel also asked Bell whether he had any other convictions, but Bell responded that he could not remember.

DECIDED AUGUST 19, 2019.

Murder. Jenkins Superior Court. Before Judge Peed.

*David J. Walker*, for appellant.

*Richard A. Mallard, District Attorney, Keith A. McIntyre, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.