307 Ga. 527
FINAL COPY

S19A1342.  REED v. THE STATE.


NAHMIAS, Presiding Justice.

Appellant Hentrez Reed was convicted of malice murder and other crimes in connection with the shooting death of Nigel James. On appeal, he contends that his trial counsel provided ineffective assistance in three ways: (1) by not filing a motion to suppress inculpatory statements Appellant made during his interview by the police; (2) by not filing a motion to suppress his historical cell site location information; and (3) by not objecting to the admission of testimony regarding an "affidavit" he wrote and the admission of an accompanying note written by a co-defendant. We affirm.[1]

---

[1] James was killed on September 1, 2015. On December 4, 2015, a Newton County grand jury indicted Appellant for malice murder, two counts of felony murder, criminal attempt to commit armed robbery, aggravated assault, possession of cocaine with intent to distribute, theft by receiving stolen property (a 9mm handgun), and possession of a firearm during the commission of a felony. Curtis McCammon and Areon Clemons were each separately indicted for similar crimes except the cocaine and theft charges. Clemons entered negotiated guilty pleas and testified for the State at the joint trial of Appellant and McCammon, which began on March 20, 2017. On March 22, the

1. As described in our opinion affirming the convictions of Appellant's co-defendant Curtis McCammon, when viewed in the light most favorable to the verdicts, the evidence presented at their joint trial showed the following:[2]

> According to Areon Clemons, on the afternoon of September 1, 2015, McCammon called Clemons to ask for a ride. McCammon and Clemons had been friends for about six months, during which the two men would "[s]moke weed, play basketball together, [and] burglarize houses." McCammon had just stolen some televisions and needed help transporting them. Clemons drove to meet McCammon in the Ellington residential community in Covington, and McCammon told him that Nigel James was coming to meet them to buy the stolen televisions. After James left the community with two televisions, McCammon and Clemons went to buy marijuana from a drug dealer they knew as "Dizzy." That evening, James

---

jury found them guilty on all counts. The trial court sentenced Appellant to serve life in prison for malice murder and consecutive terms of 15 years for attempted armed robbery, 10 years for the cocaine offense, 10 years for theft, and five years for the firearm offense. The felony murder counts were vacated, and the aggravated assault count merged. Appellant filed a timely motion for new trial through his trial counsel, which he amended twice through new counsel and one more time with his current counsel. After a hearing on October 23, 2018, the trial court denied the motion on March 12, 2019. Appellant then filed a timely notice of appeal, and the case was docketed in this Court for the August 2019 term and orally argued on October 22, 2019.

[2] Because Reed rather than McCammon is now the appellant at issue, throughout this quoted passage the original "Reed" has been changed to "Appellant," and "Appellant" has been changed to "McCammon." These changes are not indicated with brackets.

called McCammon to say that he wanted some money back because one television was not the right size, and they agreed to meet at the community's pool house.[3]

On the way there in Clemons's car, McCammon told Clemons that he wanted to rob and kill James. McCammon had seen James with cash when James paid for the televisions earlier that day. McCammon told Clemons to stop at Appellant's house on the west side of the Ellington community so McCammon could get a gun. Appellant was using drugs when they arrived. Appellant then joined McCammon and Clemons, and Clemons drove to a street near the pool house, where they parked. The three men walked to the rear of the pool house to wait for James. As they waited, Appellant showed McCammon how to use the gun and told him not to be scared. When James arrived, Clemons ran back to his car as McCammon and Appellant walked toward James's car; the gun was in McCammon's hand. As Clemons ran, he heard several gunshots. McCammon and Appellant then returned to Clemons's car; they apparently had not taken anything from James. As Clemons drove away, McCammon and Appellant said that they wanted to go rob Dizzy (the drug dealer) because they believed Dizzy would have cash they could steal. Clemons refused, however, and instead he dropped off McCammon and Appellant at Appellant's house and left.

James had been shot several times, but he managed to drive away from the pool house area toward the east side of the community. Minutes later, a teenager called

---

[3] James's girlfriend testified that James told her that he bought the televisions from his friends "over in the Ellingtons." She did not know their real names. She said that when James realized that one of the televisions was too small, he told her that he was going back to meet with his friends to exchange it or get his money back.

3

911 to report that a man was yelling for help, saying he had been shot, and banging on the front door of the teenager's home and neighbors' homes. Responding officers found James lying in the grass with a garden hose running water over his bleeding wounds. His car was stopped in the middle of the street with the engine still running; the car had blood and bullet holes in it. James told the officers that he had been shot near the bridge and the lake, which were next to the pool house. He asked the officers for his cell phone, indicating that it would have information about the shooter on it, but the officers could not find the cell phone at that time. James was taken to a hospital, but soon died. The police found about $1,300 in cash in James's belongings at the hospital.

Eight days later, police officers arrested McCammon and Clemons as they were driving away from a house that they had just burglarized. In an interview with the police, McCammon admitted that he had sold stolen televisions to James and that James had called him later that day to get a refund for the television that was too small. After telling the police a variety of stories, Clemons confessed to his, Appellant's, and McCammon's involvement in the murder.

[About two weeks after the murder, detectives interviewed Appellant at the police station. He denied any knowledge of the murder and claimed that he was not home that evening but instead was in Riverdale, approximately 20 to 30 miles away from the Ellington community. He also initially denied knowing anything about the gun used in the murder. Eventually, however, Appellant admitted knowing where the gun was located. He then took the detectives to his brother's home to retrieve the gun – a .45-caliber pistol – which he had hidden behind a washing machine. Appellant also admitted buying a 9mm handgun that he knew was

stolen. The same day Appellant was interviewed, the police searched his home and car. They found the stolen 9mm handgun, cocaine, baggies, a baggie sealer, and a scale.]

According to Clemons, he and McCammon were in jail in adjoining cells and were talking when McCammon slid a one-page, handwritten document under the door to Clemons. On the front of the document was an affidavit stating (falsely) that Clemons had stolen the murder weapon from Appellant's house without Appellant's knowledge. On the back was a note indicating that Appellant wanted McCammon to sign the affidavit, but that McCammon was not going to do that. Clemons believed that Appellant wrote the affidavit and that McCammon wrote the note on the back.[4] Clemons later

---

[4] The document was admitted into evidence at trial. At trial, Clemons, whose nickname is "Too Tall," read the affidavit on the front of the document aloud for the jury as follows:

[Y]our first and last name hereby does [s]tate the following: I . . . went to Mrs. Bennett's house, [Appellant's] mom, to sell a flat-screen TV. [Appellant] opened the garage to take a look at the TV and see if it was working. So me and Too Tall put the TVs in the garage. After looking at the flat-screen, [Appellant] went back into his mom's house[.] I noticed that Too Tall was going through bags and boxes inside the garage while [Appellant] was in the house. After we left is when I noticed that Too Tall had taken the gun from the garage. At no time did [Appellant] know that Too Tall had took a firearm and neither did I mention anything to [Appellant] about the firearm. A week or so after we had seen [Appellant], he, [Appellant], called looking for a firearm and that's when I told him . . . Too Tall had it and that I would . . . get it back from him. I called and asked [Appellant] for his whereabouts. I took the firearm . . . back to [Appellant]. At no time did [Appellant] know anything about the firearm was in the crime. Neither did [Appellant] know that Too Tall had taken the firearm from the garage only until he called and ask[ed] did we have it is when I

entered a negotiated guilty plea to conspiracy to commit murder, attempted armed robbery, aggravated assault, and a gun crime, for which he was sentenced to serve a total of 10 years in prison followed by 25 years on probation. In exchange, Clemons testified for the State at McCammon's and Appellant's joint trial.

At the trial, the medical examiner who performed James's autopsy testified that James suffered five gunshot wounds — four to the left side of his torso and one to his right leg. Two of the wounds to his lower torso caused severe and ultimately fatal internal bleeding. Bullets recovered from James's body and from the crime scene matched the [.45-caliber] gun that Appellant had hidden at his brother's house. Cell phone records showed that McCammon's and James's phones called each other three times just minutes before the murder, that McCammon's and Appellant's phones were in the Ellington community area at the time of the murder, and that — although McCammon and Appellant had no phone contact in the 11 days before the murder — McCammon's phone communicated with Appellant's phone 36 times throughout the eight days between the murder and McCammon's arrest.

Appellant did not testify.

*McCammon v. State*, 306 Ga. 516, 517-519 (832 SE2d 396) (2019)

---

told him Too Tall had taken it and I would get [it] back from him. . . . [U]nder penalty of perjury the foregoing is true and correct to the best of my knowledge.

The note on the back of the document, which Clemons also read to the jury, says: "This what [Appellant] wanted me to write about you but I'm not gonna do it, I f**k with you bruh. What you gonna do about your statement[?] I'm thinking about going to trial[;] what you thinking about doing? Write me back whenever you can[.]"

6

(bracketed paragraph added to include evidence specific to Appellant).

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *McCammon*, 306 Ga. at 520. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that his trial counsel provided ineffective assistance in three ways. To prevail on these claims, Appellant must prove that his counsel's performance was professionally deficient and that he was prejudiced as a result. See *Strickland v.*

*Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690; *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). "'[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Stripling v. State*, 304 Ga. 131, 138 (816 SE2d 663) (2018) (citation omitted). To establish prejudice, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "We need not review both elements of this test if the appellant fails to prove one of them." *Stripling*, 304 Ga. at 138.

(a) Appellant first argues that his trial counsel provided ineffective assistance by failing to file a motion to suppress his

statements that led the police to the murder weapon. Appellant asserts that his incriminating statements during his police interview were involuntary and inadmissible under OCGA § 24-8-824 because they were induced by a "hope of benefit," namely, promises by the detectives that he would not be charged with murder. The record does not support this assertion.

At the outset of the interview, which occurred at the police station, Appellant was advised of and waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 444-445 (86 SCt 1602, 16 LE2d 694) (1966), both orally and on a written form.[5] Appellant denied any knowledge of the murder and initially denied knowledge of the murder weapon. After further questioning by the detectives, Appellant claimed that McCammon had stolen a pistol from his garage and that he did not know where the pistol was located. The detectives then repeatedly encouraged Appellant to tell the truth and to lead them to the murder weapon, saying that they could then

---

[5] The interview was audio-recorded, and the recording is in the record. At trial, however, the recording was not admitted into evidence or played for the jury; instead, a detective testified about some of Appellant's statements.

9

test the gun to prove who pulled the trigger and whether Appellant was involved beyond his claim that the pistol had been stolen. They told Appellant several times that they could place him at the scene of the murder. A detective later said: "You need to help yourself limit the problems that are facing you, right at you. Cause it's facing you right now. You're looking at a murder charge." Several minutes later, one detective told Appellant: "Nothing else is going to help. If [the lead detective is] fixing to take murder charges on you right now . . . ." Later, the detectives indicated that they were ending the interview, telling Appellant, "Malice murder. Armed robbery. You're going for all that." After some more back and forth about the pistol, Appellant admitted knowing its location, and he later led the detectives to it at his brother's home.

For a confession to be admissible under Georgia law, "it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-

8-824.[6] "It has long been understood that 'slightest hope of benefit' refers to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Budhani v. State*, 306 Ga. 315, 325 (830 SE2d 195) (2019) (citation and punctuation omitted). By contrast, exhortations or encouragement to tell the truth and comments conveying the seriousness of a suspect's situation do not render his subsequent statements involuntary. See, e.g., *Johnson v. State*, 295 Ga. 421, 424-425 (761 SE2d 13) (2014) (holding that the interviewing detective's warning that he "can get up and walk out this door and send your a** to the county jail and change this charge from aggravated assault to a f**ing murder charge" was not an impermissible hope of benefit but rather "a true statement that emphasized the gravity of the situation [the suspect] faced"); *Rogers v. State*, 289 Ga. 675, 678-679 (715 SE2d 68) (2011) (holding that the interviewing officer's

---

[6] This provision in the current Evidence Code tracks the language of former OCGA § 24-3-50, and there is no counterpart in the Federal Rules of Evidence. We therefore may rely on our precedents applying both the old and the current statute. See *State v. Chulpayev*, 296 Ga. 764, 771 (770 SE2d 808) (2015).

statement that the suspect should "help [him]self" was an encouragement to tell the truth and not an impermissible hope of benefit); *Preston v. State*, 282 Ga. 210, 212 (647 SE2d 260) (2007) (holding that the interviewing officer's discussion of the death penalty and life without parole "amounted to no more than an explanation of the seriousness of [the suspect's] situation"); *Pittman v. State*, 277 Ga. 475, 477 (592 SE2d 72) (2004) (holding that the interviewing detective's urging the suspect to tell the truth so that the detective could work with his information and try to help him was not an impermissible hope of benefit).

Considered in the context of Appellant's interview, the detectives' references to murder charges were explanations to Appellant of the seriousness of his situation. The detectives never promised Appellant that he would not be charged with murder if he helped them locate the murder weapon, nor did they say that Appellant would not be charged if they found other evidence implicating him in James's murder. Instead, they indicated that if the gun was recovered, forensic testing could determine who pulled

12

the trigger and that Appellant might thus "help [him]self" to show that he was not the shooter. See, e.g., *Johnson*, 295 Ga. at 425 ("At no time did [the detective] indicate that a confession would result in lesser charges; rather, he merely suggested that [the suspect] would be well served by offering his version of events as a means of justifying or mitigating his role in the assaults."). Thus, Appellant's statements leading the detectives to the murder weapon were not induced by a hope of benefit in violation of OCGA § 24-8-824; a motion to suppress on that ground would have been properly denied; and Appellant's trial counsel did not perform deficiently by failing to make that meritless motion. See *Hampton v. State*, 295 Ga. 665, 670 (763 SE2d 467) (2014) ("[T]he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel.").

(b) Appellant next argues that his trial counsel provided ineffective assistance by failing to file a motion to suppress his historical cell site location information ("CSLI") — evidence that put his cell phone in the area of the Ellington community at the time of

the murder and thus undermined his claim to the police that he was in Riverdale at that time. Appellant contends that because the police obtained 32 days of his CSLI from his wireless carrier using a subpoena rather than a court order or a search warrant, that evidence should have been suppressed. Again, however, Appellant has not shown that his counsel's performance was deficient.

Appellant's argument that his CSLI was obtained illegally because the police used a subpoena rather than a court order is contradicted by the record, which shows that the police *did* use a court order to obtain the CSLI. As for the need to use a search warrant instead, in June 2018, the United States Supreme Court held in *Carpenter v. United States*, __ U.S. __ (138 SCt 2206, 201 LE2d 507) (2018), that under the Fourth Amendment to the United States Constitution, law enforcement officers generally must obtain a search warrant supported by probable cause before acquiring CSLI from a wireless carrier, at least if the CSLI is for seven days or more. See 138 SCt at 2217 & n.3, 2222-2223.

*Carpenter* was decided more than a year after Appellant's trial,

however, and

> [i]n making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law, and only in a rare case would it be ineffective assistance by a trial attorney not to make an objection that would be overruled under prevailing law. Although this Court has held that a new decision applies to the admission of evidence in cases pending on direct review at the time that opinion was issued, that does not alter the long-standing precedent that, when addressing a claim of ineffectiveness of counsel, the reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial. Thus, a new decision does not apply in a manner that would require counsel to argue beyond existing precedent and anticipate the substance of the opinion before it was issued.

*Walker v. State*, 306 Ga. 579, 583 (832 SE2d 420) (2019) (citation and punctuation omitted). At the time of Appellant's trial, Georgia appellate precedent held that a search warrant was not required to obtain CSLI. See *Smarr v. State*, 317 Ga. App. 584, 594 (732 SE2d 110) (2012). Some federal appellate courts, including the Eleventh Circuit, held the same. See, e.g., *United States v. Davis*, 785 F3d 498, 511-513 (11th Cir. 2015) (en banc). Appellant's trial counsel was not deficient (and thus was not ineffective) for failing to predict the 5-4 decision in *Carpenter*. See *Walker*, 306 Ga. at 583.

(c) Finally, Appellant argues that his trial counsel provided ineffective assistance by not objecting to the admission of the "affidavit" document and Clemons's testimony about it. Appellant contends that this evidence should have been excluded because it was inadmissible hearsay and that the admission of the document also violated the Confrontation Clause of the Sixth Amendment to the United States Constitution.

To begin with, Clemons's testimony in court about the circumstances in which McCammon gave him the document and about his belief that Appellant wrote the affidavit and McCammon wrote the note on the back was not hearsay. Although Clemons explained that he was "talk[ing] to [McCammon] through the [jail cell] door" when McCammon slid the document under the door, Clemons did not testify about anything McCammon said to him. Nor did Clemons indicate that he relied on anything McCammon said when McCammon passed him the document as the reason for his belief that Appellant wrote the affidavit and McCammon wrote the note. See *McCammon*, 306 Ga. at 523 ("[E]ven if Clemons was not

16

familiar with [McCammon's] handwriting, the references in the document and the circumstances in which Clemons received it authorized the court to find that the State had properly authenticated the note."). See also *Brown v. State*, 332 Ga. App. 635, 639-640 (774 SE2d 708) (2015).[7]

As for the affidavit written by Appellant, it was hearsay, but it was nevertheless admissible as an admission by a party-opponent. See OCGA § 24-8-801 (d) (2) (A) ("Admissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is . . . [t]he party's own statement . . . ."). And such an admission by a defendant generally is not subject to the Confrontation Clause. See *United States v. Carr*, 607 Fed. Appx. 869, 877 (11th Cir. 2015) ("A defendant's own statements . . . do not implicate the Confrontation Clause and are admissible under Rule 801 (d) (2) (A) of the Federal Rules of Evidence, as admissions by a party-opponent."); *United States v. Tolliver*, 454 F3d 660, 665 (7th

---

[7] Unlike McCammon, Appellant does not enumerate any error regarding the authentication of the document.

17

Cir. 2006) (holding that admissions by a party-opponent are not subject to the Confrontation Clause because they are excluded from the hearsay rule).[8] See also Artem M. Joukov, Isn't That Hearsay Anyway? How the Federal Hearsay Rule Can Serve as a Map to the Confrontation Clause, 63 Wayne L. Rev. 337, 350-351 (2018) ("It would be counter-intuitive for the Confrontation Clause to exclude [a defendant's own prior communications], since any objection to the introduction of a defendant's confession under this clause would be the equivalent of a defendant demanding to confront himself or herself."). Thus, a hearsay or Confrontation Clause objection to the admission of the affidavit would have been meritless, and counsel did not perform deficiently by not making such an objection. See

---

[8] The Federal Rules of Evidence refer to admissions by a party-opponent as "not hearsay," see Fed. R. Evid. 801 (d), while the Georgia Evidence Code refers to such admissions as an "exclusion[ ]" from the hearsay rule. See OCGA § 24-8-801 (d). This is a distinction without a difference. See Paul S. Milich, Georgia Rules of Evidence, § 18:3 n.5 (2019-2020 ed.) (explaining that the federal rules label admissions by a party-opponent as "not hearsay" for mostly academic reasons, and that the Georgia Evidence Code "avoid[s] any confusion by simply treating admissions as exceptions to the hearsay rule"). Because OCGA § 24-8-801 (d) (2) (A) is essentially identical to its federal counterpart, we look to decisions of the federal appellate courts for guidance in its application. See *Kemp v. State*, 303 Ga. 385, 392 n.6 (810 SE2d 515) (2018).

*Hampton*, 295 Ga. at 670.

A Confrontation Clause objection to the note written by McCammon on the back of the document would have been equally meritless. "The admission of an out-of-court statement into evidence at a criminal trial comes within the scope of the Confrontation Clause only if the statement was 'testimonial.'" *Billings v. State*, 293 Ga. 99, 103 (745 SE2d 583) (2013) (citations omitted). "A statement is testimonial if its primary purpose was to establish evidence for use in a future prosecution." *Allen v. State*, 300 Ga. 500, 504 (796 SE2d 708) (2017). McCammon wrote the note to inform Clemons that Appellant was unsuccessfully trying to have McCammon adopt the affidavit and to ask what Clemons was doing about his own statement and whether he was going to trial. The note was not intended for use in a future prosecution, so it was not testimonial, and trial counsel's failure to object to its admission as a violation of the Confrontation Clause was not deficient. See *Hampton*, 295 Ga. at 670.

The only remaining question is whether Appellant's trial

counsel was ineffective for not objecting to the note as hearsay. Pretermitting whether such an objection would have succeeded, the admission of the note was not prejudicial. For the most part, the note was a communication from McCammon to Clemons regarding their own statements and trials. The note also may have suggested that the affidavit that Appellant drafted was untrue, but it did not say that explicitly, and McCammon may have had other reasons for telling Clemons that he would not say what was in the affidavit. In any event, the main evidence of the affidavit's lack of veracity came from Clemons's testimony about the events surrounding the murder and from the other evidence of Appellant's guilt, including the false alibi he gave the police, his connection to the murder weapon, and the cell phone records. Under these circumstances, we cannot say that the admission of the note alone, even if erroneous, causes us to lack confidence in the outcome of the trial. See *Strickland*, 466 U.S. at 694.

*Judgment affirmed. All the Justices concur.*

DECIDED DECEMBER 23, 2019.

Murder. Newton Superior Court. Before Judge Ott.

*Brian Steel*, for appellant.

*Layla H. Zon, District Attorney, Amber R. Bennett, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.