308 Ga. 185
FINAL COPY

S19A1579. TOLBERT v. THE STATE.

NAHMIAS, Presiding Justice.

In 2005, Appellant Contresstis Tolbert and his co-defendant Jeremy Butts were found guilty of malice murder and other crimes in connection with the shooting death of Robert Funderburk. In this long-delayed appeal, Appellant contends that the trial court erred by denying his motion to suppress his post-arrest statements to the police and by admitting "similar transaction" evidence.[1] Those claims are meritless, so we affirm.[2]

---

[1] Appellant was tried under Georgia's old Evidence Code. The admission of other acts evidence is now generally governed by OCGA § 24-4-404 (b).

[2] Funderburk was killed on October 31, 2001. On September 24, 2002, a Muscogee County grand jury indicted Appellant and Butts for malice murder, felony murder, armed robbery, and possession of a firearm during the commission of a felony. At a joint trial from January 24 to 26, 2005, the jury found both defendants guilty of all charges. The trial court sentenced Appellant to serve life in prison for malice murder, a consecutive life sentence for armed robbery, and five consecutive years for the firearm offense. The court incorrectly noted on the final disposition form that the jury found Appellant not guilty of the felony murder count, which actually was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (434 SE2d 479) (1993). Through his trial counsel, Appellant filed a timely motion for new trial on

1. Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. In late October 2001, Funderburk traveled from his home in Warm Springs to Columbus, hoping to find a job there. When Funderburk arrived at a motel on Veterans Parkway, he had at least $190 with him. Sometime between 11:00 p.m. on October 30 and 1:00 a.m. on October 31, Funderburk, who was white, met Darnell Henry, who is black, at a convenience store near the motel. They walked around and drank beer together, and Funderburk bought Henry some crack cocaine. At some point, they walked to the motel parking lot, where a short black man asked if they wanted to buy drugs. Funderburk replied that he did not have any money, and he and Henry later returned to Funderburk's motel room.

Kevin Burton, who was also staying at the motel that night,

---

February 22, 2005. He apparently was then represented by several different attorneys, but nothing happened in court for more than 14 years. In April 2019, Appellant filed an amended motion through his current counsel; after holding a hearing, the trial court denied the motion on June 3, 2019. Appellant then filed a timely notice of appeal, and the case was docketed to this Court's August 2019 term and submitted for decision on the briefs. It is not clear what happened to Butts's case after trial; no appeal by him has come to this Court.

heard a knock on the door of his room around 2:30 or 3:00 a.m. He opened the door and saw two black men. One of the men, whom Burton identified at trial as Appellant, said that he recognized Burton because they had been incarcerated together in the county jail. Appellant also said that he and his associate were "looking for a white guy." Burton told them that there was a white man in the room next to his.

According to Henry, at some point after he and Funderburk returned to Funderburk's room, they heard a knock on the door. When Funderburk opened it, two black men barged in. One of the men was the short man who had approached them in the parking lot.[3] He had a small gun in his hand, and he and his associate demanded money from Funderburk, who told them, "you can't mess with me" and "I ain't got nothing." The short man fired a shot, which Henry thought went into the ceiling. Henry then fled from the room.

Around 10:00 a.m., police officers responded to a 911 call

---

[3] Henry testified that he could not identify the assailants. Appellant and Butts are black, and other witnesses described Appellant as short and Butts as tall.

reporting an unresponsive person in a room at the motel. They found Funderburk dead on the floor of his room. He was killed by a single shot to his chest; the medical examiner recovered a .22-caliber bullet from Funderburk's body.

Just after midnight on November 4, four nights after Funderburk was killed, Appellant and Butts were arrested as they fled after robbing a liquor store in Columbus. When Appellant was interviewed later that morning by Detective Tom Plock of the Columbus Police Department's robbery-assault unit, he said that he had information about a murder; he was then interviewed further by Detective Bill Griffis of the homicide unit, who was investigating Funderburk's murder.

During the interview with Detective Griffis, Appellant said that he was at the motel when Funderburk was shot; that a black man had asked Appellant if he had any drugs for sale but did not buy drugs from him; that Appellant went to "the wrong room," where he recognized a man that he knew; that Appellant, who was carrying a "gun," then went to Funderburk's room; that the black man was in

4

the room but ran out after a shot was fired by "someone else"; and that money was taken from Funderburk, which "they" divided. Butts was also interviewed by Detective Griffis. Butts said that he was at the motel that night; that he went to the "wrong room"; that he was carrying a "pistol" and was in Funderburk's room when Funderburk was shot; and that "another individual" was also there, whom Butts grabbed and held down on the bed. Neither Appellant nor Butts admitted shooting Funderburk.[4]

That same day, another detective received a tip that the murder weapon was located in an apartment where Lorraine Washington, who had known Appellant and Butts for many years, lived with her son Jonathan. When the detective went to the apartment, Washington told him that the gun was in a box in the kitchen. In the box, the detective found a .22-caliber revolver with five bullets in its six-bullet chamber. Testing later showed that the

---

[4] This paragraph summarizes Appellant's and Butts's interview statements as presented to the jury at trial in redacted form so as not to directly mention the other assailant's identity, thus avoiding a violation of *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968).

bullet found in Funderburk's body had been fired from the revolver.

The detective interviewed Washington later that day. She said that three days after the murder, Butts had given her the revolver and told her "to put it up."[5] Her son Jonathan testified at trial that he sold the .22-caliber revolver to Appellant; that Butts may have been there when Jonathan sold Appellant the gun; that Appellant later gave the gun back, saying that he had "done some dirt" with it; and that Jonathan then put the gun in a box.

The State also presented evidence of four other criminal incidents involving Appellant and Butts around the time of the murder: an armed robbery at a liquor store in Columbus on the night of October 5; an armed robbery at another local liquor store around 10:00 p.m. on October 31, late on the same day as the murder; an attempted armed robbery at a Columbus restaurant in the early morning hours of November 3; and the armed robbery at the liquor store just after midnight on November 4 that led to their arrest.

Appellant and Butts did not testify. Appellant's counsel argued

---

[5] At trial, Washington recanted her statement to the detective.

that the case had not been thoroughly investigated; that Jonathan killed Funderburk; and that the murder stemmed from a drug deal, while the similar transaction evidence showed that Appellant robbed businesses. Butts's counsel argued that Appellant was solely responsible for killing Funderburk.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-20 (defining parties to a crime); *Green v. State,* 304 Ga. 385, 387-388 (818 SE2d 535) (2018) ("'It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence

7

insufficient.'" (citation omitted)).

2. Appellant contends that the trial court erred by failing to suppress the statements he made to Detectives Plock and Griffis when they interviewed him after his arrest four nights after the murder. Appellant argues that his statements were induced by a "hope of benefit," in violation of former OCGA § 24-3-50, and that they were not voluntarily made, in violation of the United States and Georgia Constitutions. In reviewing a ruling on a motion to suppress, "we accept the trial court's findings on disputed facts and credibility of witnesses unless clearly erroneous . . . and independently apply the legal principles to the facts." *Philpot v. State*, 300 Ga. 154, 158 (794 SE2d 140) (2016) (citation and punctuation omitted). Here, the record supports the trial court's conclusion that Appellant's statements were admissible.

(a) At a pretrial hearing, Detective Plock testified that when Appellant was arrested after he robbed the liquor store, he was taken to the police station, where the detective advised Appellant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16

LE2d 694) (1966), and interviewed him.[6] During the interview, Detective Plock received information that Appellant and Butts matched the descriptions of assailants who were involved had other recent armed robberies. When the detective began to question Appellant about those robberies, Appellant said that "he wanted to help himself." Detective Plock assumed that Appellant wanted to give him information about the location of a house where crack cocaine was sold and said, "well, telling me where a crack house is is not going to help you with all of these armed robberies."

Appellant then said that he wanted to talk about a murder. Detective Plock notified his supervisor and a homicide investigator. He also told Appellant that a homicide detective was going to interview him. Detective Plock then continued to interview Appellant about the robberies. The detective testified that when the interview began, he did not know that Appellant had any

---

[6] At trial, Detective Plock testified that Appellant waived his rights and also signed a form waiving his rights, which was admitted into evidence. This evidence was not presented at the pretrial hearing but was referred to by the trial court in its order denying Appellant's motion for new trial.

information about Funderburk's murder. Detective Plock also testified that he never told Appellant that the robbery charges would be dismissed, he never told Appellant that he would receive any leniency, he never made any threats or promises to Appellant, and he always tells suspects that he does not have the authority to make such promises.

At the hearing, Detective Griffis testified that he received a call notifying him that Appellant wanted to discuss a murder; that he arrived at the police station around 5:00 a.m.; that he advised Appellant of his *Miranda* rights, and Appellant signed a form waiving those rights, which was admitted into evidence; and that he then interviewed Appellant about Funderburk's murder. Detective Griffis testified that he did not threaten Appellant or offer Appellant any sort of reward or benefit.

By contrast, Appellant testified at the hearing that Detective Plock asked him if he knew anything about a motel room murder; that Detective Plock told Appellant that "they can help [him] out in the armed robbery case if [he] ma[d]e a statement on the murder

10

case"; and that Detective Plock said that "if [Appellant told] them about the murder that [Detective Plock was] going to help [Appellant] on all the armed robbery charges, get them dropped down to a lesser crime." Appellant also testified that both detectives told him that he would not be charged with murder if he provided information and that he made his statements about the murder because he thought he would get a better deal.

At the end of the hearing, the trial court said that it found the testimony of the detectives "infinitely more credible" than Appellant's testimony. The court then ruled that Appellant's statements were not induced by a hope of benefit and were admissible.

(b) Former OCGA § 24-3-50, which was in effect at the time of Appellant's 2005 trial, said: "To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." "It has long been understood that 'slightest hope of benefit' refers to promises related to reduced criminal punishment — a shorter

11

sentence, lesser charges, or no charges at all." *Reed v. State*, 307 Ga. 527 (837 SE2d 272) (2019) (citation and punctuation omitted).[7]

Although Appellant claimed at the pretrial hearing that Detective Plock promised him that the armed robbery charges would be reduced to lesser crimes and that both detectives promised that he would not be charged with murder if he told the police about the shooting, the trial court explicitly found that Appellant's testimony was not credible. The court instead credited Detective Plock's testimony that he never said Appellant would receive any leniency, he made no promises to Appellant, and he always tells suspects that he does not have the authority to make such promises, as well as Detective Griffis's testimony that he did not offer Appellant any sort of reward or benefit. See, e.g., *Hester v. State*, 282 Ga. 239, 243 (647 SE2d 60) (2007) ("The trial court was entitled to weigh the credibility of witnesses at the . . . hearing and to accept the

---

[7] OCGA § 24-8-824, a "provision in the current Evidence Code[,] tracks the language of former OCGA § 24-3-50, and there is no counterpart in the Federal Rules of Evidence. We therefore may rely on our precedents applying both the old and the current statute." *Reed*, 307 Ga. at 533 n.6.

testimony of the more credible witness.").

Appellant contends, however, that even if — contrary to his own testimony at the hearing — the detectives did not *explicitly* promise that the armed robbery charges would be reduced and that he would not be charged with murder in exchange for information about the shooting, the detectives *implied* that he would receive some benefit. Appellant asserts that Detective Plock's comment, after Appellant said "he wanted to help himself," that information about the location of a "crack house" would not "help" with the armed robbery charges, followed by the detective's notifying Detective Griffis after Appellant said he had information about a murder, implied that his providing that information would result in lesser or no charges. As we have explained many times, however, an interviewing officer's comments conveying the seriousness of a suspect's situation or encouraging him to tell the truth — which may include references to how he might "help" himself — do not render his subsequent statements involuntary under former OCGA § 24-3-50. See, e.g., *Reed*, 307 Ga. at 533 (holding that the interviewing

13

detective's telling the suspect that he might "help [him]self" to show he was not the shooter by telling the police where the murder weapon was, so that it could be forensically tested, was not a promise that he would not be charged with murder if he did so); *Wilson v. State*, 293 Ga. 508, 510 (748 SE2d 385) (2013) (concluding that the defendant's asking an investigator to "help [him] out" and the interviewing detective's responding, "All right. What I've got to do before I can talk to you is read you your rights, OK?" did not constitute an impermissible hope of benefit); *Rogers v. State*, 289 Ga. 675, 678-679 (715 SE2d 68) (2011) (holding that the interviewing officer's statement that the suspect should "help [him]self" was an encouragement to tell the truth and not an impermissible hope of benefit).

In this case, Detective Plock's statement that information about crack cocaine dealing would not help Appellant with the numerous armed robbery charges he faced was simply an indication of the seriousness of Appellant's situation. And Detective Plock's summoning Detective Griffis — a homicide investigator — to

14

interview Appellant after Appellant clarified that he wanted to talk about a murder was merely bringing in someone who might know what Appellant was talking about, not an act that reasonably implied that Appellant would get his robbery charges reduced or that he would not be charged with murder if he did what he said he wanted to do. See *Rivers v. State*, 296 Ga. 396, 400 (768 SE2d 486) (2015) (explaining that an appellant's "personal belief that talking to detectives would gain him favor from the State does not render his statements involuntary under former OCGA § 24-3-50"). Accordingly, the trial court did not err in concluding that Appellant's statements to the detectives were not induced by an impermissible hope of benefit.

(c) We turn next to Appellant's claim that his custodial statements were involuntary as a matter of constitutional law. The record shows that at the time of the interviews, Appellant was 19 years old and had completed the tenth grade, and that after he was advised of his *Miranda* rights by Detective Plock and again later by Detective Griffis, Appellant signed forms waiving those rights. In

15

addition, both detectives testified at the pretrial hearing that they did not make any promises or threats to Appellant. Detective Griffis also testified at the hearing that Appellant did not appear to be under the influence of drugs or alcohol, that he answered the detective's questions intelligently, and that he did not ask for an attorney or request that the interview end. The record therefore supports the trial court's finding, under the totality of the circumstances, that Appellant's statements were voluntary and admissible as a matter of constitutional law. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (93 SCt 2041, 36 LE2d 854) (1973); *Olevik v. State*, 302 Ga. 228, 251 (806 SE2d 505) (2017).

3. Appellant also contends that the trial court erred by admitting similar transaction evidence that he and Butts committed three armed robberies and an attempted armed robbery in Columbus around the time of the murder. We disagree.

Under the old Evidence Code, evidence of a so-called "similar transaction" was admissible if the State showed:

(1) it seeks to introduce the evidence "not to raise an

16

improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) "there is sufficient evidence to establish that the accused committed the independent offense or act"; and (3) "there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."

*Moore v. State*, 290 Ga. 805, 807 (725 SE2d 290) (2012) (quoting *Williams v. State*, 261 Ga. 640, 642 (409 SE2d 649) (1991)). That test applied whether the similar transaction occurred before or after the charged crimes. See *Whitehead v. State*, 287 Ga. 242, 249 (695 SE2d 255) (2010). When considering the admissibility of a similar transaction, the proper focus was on the similarities, not the differences, between the separate acts and the charged crimes. See id.

At a pretrial hearing, the prosecutor proffered that the State's similar transaction evidence would show that on the night of October 5, 2001 (a few weeks before the murder), Appellant and Butts used small-caliber guns to hold employees at gunpoint and steal money from a liquor store in Columbus. The prosecutor also represented that on the night of October 31 (late on the same day as

17

the murder), Appellant and Butts brandished small-caliber guns and stole money from another Columbus liquor store. The prosecutor further proffered that Appellant and Butts went to a Columbus restaurant in the early morning hours of November 3; one of them approached an employee, pointed a small silver pistol at her, and demanded money; the employee fought back; and Appellant and Butts fled. Finally, the prosecutor represented that Appellant and Butts robbed another Columbus liquor store around midnight on November 4 and that Appellant was carrying a .22-caliber pistol when he and Butts were arrested after they fled the scene. Appellant objected on the ground that these incidents were not sufficiently similar to the charged crimes, but the trial court ruled that the evidence was admissible.

During the trial, the State presented testimony from victim employees at the three liquor stores and the restaurant and from the officer who arrested Appellant as he fled after the final robbery; their testimony was substantially similar to the pretrial proffer. Appellant stipulated to his convictions for those crimes, and

Detective Plock testified that during Appellant's interview, he admitted participating in the incidents. The trial court instructed the jury that this evidence could be considered only for the purposes of showing Appellant's motive, intent, state of mind, and course of conduct.

The trial court admitted the evidence of the other incidents for appropriate purposes under Georgia law at the time of Appellant's trial.[8] And there was ample evidence that Appellant committed the other acts. Finally, the evidence that Appellant and Butts, working together and using small-caliber guns, committed three armed robberies and an attempted armed robbery in Columbus at night or in the early morning hours within less than a month of the murder was sufficiently similar to the charged crimes in this case — where

---

[8] Under the old Evidence Code, "courts routinely admitted similar transaction evidence for purposes such as 'bent of mind' or 'course of conduct.'" *Matthews v. State*, 294 Ga. 50, 52 n.2 (751 SE2d 78) (2013). The current Evidence Code allows admission of "evidence of other crimes, wrongs, or acts" for purposes "including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404 (b). "Bent of mind" and "course of conduct" are no longer authorized purposes. See *Brooks v. State*, 298 Ga. 722, 727 (783 SE2d 895) (2016).

Appellant and Butts were accused of using a small-caliber gun to commit an armed robbery against Funderburk in Columbus in the early morning hours. See *Barnes v. State*, 287 Ga. 423, 426 (696 SE2d 629) (2010) ("When similar transaction evidence is used to show bent of mind, course of conduct, motive or intent, 'a lesser degree of similarity is required than when such evidence is introduced to prove identity.'" (citation omitted)). The trial court's finding that the robbery incidents were sufficiently similar to the charged crimes was not clearly erroneous, and the court did not abuse its discretion in admitting the similar transaction evidence. See, e.g., *Esprit v. State*, 305 Ga. 429, 442 (826 SE2d 7) (2019); *Alatise v. State*, 291 Ga. 428, 432 (728 SE2d 592) (2012).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 28, 2020.
Murder. Muscogee Superior Court. Before Judge Pullen.
*Randall P. Sharp*, for appellant.

20

*Julia F. Slater, District Attorney, Benjamin E. Gephardt, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.